IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ALBERT LEROY GRAHAM, JR.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:11-cv-00035 |
| v. | ) | |
| | ) | **Judge Nixon** |
| **CAROLYN W. COLVIN,** | ) | **Magistrate Knowles** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Pending before the Court is Plaintiff Albert Graham's Motion for Judgment on the Administrative Record ("Motion") (Doc. No. 16), filed with a supporting memorandum (Doc. No. 17). Defendant Commissioner of Social Security ("Commissioner") filed a Response in Opposition. (Doc. No. 20.) Subsequently, Magistrate Judge Knowles issued a Report and Recommendation ("Report"), recommending that Plaintiff's Motion be denied and the decision of the Commissioner be affirmed. (Doc. No. 22 at 1.) Plaintiff filed an Objection to the Report. (Doc. No. 23.) For the reasons stated below, the Court **ADOPTS** the Report in its entirety, **DENIES** Plaintiff's Motion, and **AFFIRMS** the decision of the Commissioner.

**I.     BACKGROUND**

*A. Procedural Background*

Plaintiff filed applications for Title II Disability Insurance Benefits ("DIB") (Tr. 111–15)[1] and Title XVI Supplemental Security Income ("SSI") (Tr. 116–18) on January 31, 2007. For both applications, Plaintiff declared an onset date of October 1, 2006. (Tr. 122.) The Social

---
[1] An electronic copy of the administrative record is docketed in this case at Doc. No. 12.

1

Security Administration ("SSA") initially denied both claims on June 18, 2007 (Tr. 66–71), and again after reconsideration on November 14, 2007 (Tr. 73–78).

Plaintiff filed a timely written request for a hearing before an Administrative Law Judge ("ALJ") on December 7, 2007. (Tr. 79.) The hearing took place before ALJ Jack B. Williams on June 25, 2009. (Tr. 12–46.) Plaintiff and vocational expert ("VE") Jo Ann Bullard testified at the hearing. (*Id.*) ALJ Williams denied Plaintiff's claim on August 5, 2009 (Tr. 51), making the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2. The claimant has not engaged in substantial gainful activity since October 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, status post multiple surgeries, depression, and substance abuse (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combinations of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to stand and/or walk for two to four hours in an eight hour workday and sit for six to eight hours in an eight hour workday. The claimant needs a sit/stand option every thirty minutes. The claimant needs to avoid frequent bending, stooping, crawling, and climbing, and other activities that would be reasonably expected to aggravate his low back problem. The claimant can relate adequately with others. The claimant can perform simple, unskilled, and semi-skilled tasks but could not perform complex or skilled tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 19, 1962 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 56–63.)

Plaintiff filed a request for review of the decision on August 18, 2009. (Tr. 10.) The Appeals Council denied Plaintiff's request on February 25, 2010, rendering ALJ Williams's decision the final decision of the Commissioner. (Tr. 1–3.) Plaintiff filed this action on March 30, 2011, seeking judicial review of the Commissioner's final decision under 42 U.S.C. §§ 405(g), 1386(c). (Doc. No. 1.)

Plaintiff filed a Motion for Judgment on the Administrative Record (Doc. No. 16), along with a supporting memorandum (Doc. No. 17) on August 8, 2011. Defendant filed a Response on October 4, 2011 (Doc. No. 20), to which Plaintiff filed a Reply on October 24, 2011 (Doc. No. 21). Magistrate Judge Knowles issued his Report recommending Plaintiff's Motion be denied on April 9, 2013. (Doc. No. 22.)

On April 24, 2013, Plaintiff filed an Objection to the Report (Doc. No. 23), specifically challenging Magistrate Judge Knowles's finding that ALJ Williams properly rejected the opinion of Plaintiff's treating physician, Dr. Richard Berkman. (*Id.* at 1.) Plaintiff argues that the Court

should reject the Magistrate's Report because Dr. Berkman described limitations that would not allow Plaintiff to perform substantial gainful activity of any kind, and his opinion should be controlling. (*Id.* at 2, 7.) The Court reviews Magistrate Judge Knowles's Report, considering Plaintiff's Objection.

   B. *Factual Background*

Plaintiff was born on July 10, 1962 (Tr. 111), and claims disability based on a neck injury, back pain, anxiety, depression, and joint pain (Tr. 70–71) that began on October 1, 2006 (Tr. 122). The administrative record contains a substantial number of Plaintiff's records dating back to 1997, with a gap between 2000 and 2006. Plaintiff's physical limitations stem from a back injury in 1997. (Tr. 221.) He has undergone three surgeries for a recurrent rupture of a disc: first in 1997 (Tr. 218–19), next in 2000 (Tr. 206–07), and finally in 2008 (Tr. 373–74). Dr. Berkman performed all three procedures and was the primary source of correspondence with Plaintiff's personal insurance and workers' compensation insurance. (Tr. 203–04, 210–17, 220–21, 347, 351, 370–72, 417.) At his administrative hearing, Plaintiff also confirmed visits to the Plateau Mental Health Center ("PMHC") for depression, anxiety, and insomnia. (Tr. 31.) Plaintiff first received psychological treatment and medication management for depression from PMHC on December 23, 2006 (Tr. 328–33), with subsequent treatment primarily provided by doctors within the Volunteer Behavioral Health Care System (Tr. 291–333, 389–416).

   1. Physical History

Plaintiff first visited Dr. Berkman in July 1997 after injuring his back and experiencing severe pain radiating down his left leg. (Tr. 221.) Dr. Berkman viewed Plaintiff's MRI and concluded that he had a free disc fragment at the L5-S1 level. (*Id.*) After administering a Medrol Dosepak and an epidural steroid block did not improve Plaintiff's condition enough to

4

return to work (Tr. 220–21), Dr. Berkman performed microdiskectomy surgery on August 12, 1997 (Tr. 218). Plaintiff successfully recovered within six months and returned to work by February 1998, with some numbness as his only residual discomfort. (Tr. 213.)

Plaintiff developed recurrent low-back pain and left-leg radiating pain in December 1999. (Tr. 211.) Dr. Berkman performed an MRI and confirmed a large recurrent free fragment disc rupture at the same disc that had ruptured in 1997. (Tr. 210.) In July 2000, Plaintiff elected to undergo surgery rather than physical therapy or cortisone shots, which had previously been ineffective. (*Id.*) Dr. Berkman surmised Plaintiff was "a gentleman in obvious distress" prior to the surgery. (Tr. 205.) On July 27, 2000, Dr. Berkman performed laminectomy surgery on Plaintiff (Tr. 206–07), and Plaintiff returned to work, although his back pain persisted (Tr. 24). In October 2000, Dr. Berkman imposed on Plaintiff, a weight-lifting restriction of thirty pounds until six months after surgery, when the restriction was raised permanently to fifty pounds. (Tr. 203.)

On February 10, 2007, Linda Collige, who resided with Plaintiff and referred to him as her best friend, submitted a Third-Party Adult Function Report to the SSA in support of Plaintiff's claims. (Tr. 152–59.) Collige described Plaintiff as very limited due to severe pain and depression. (Tr. 152–53, 159.) On February 13, 2007, Plaintiff submitted an Adult Function Report in which he explained that pain and stress from failing to contribute to the household drastically limited his daily activities. (Tr. 144–51.)

On April 28, 2007, Plaintiff saw Dr. Jerry Lee Surber as part of his disability determination. (Tr. 233–37.) In addition to a personal examination, Dr. Surber relied on two prior medical records in his assessment of Plaintiff, both from Dr. Berkman: a report following Plaintiff's surgery on August 12, 1997; and a report from August 10, 2000, recommending

5

another surgery after a recurrent L5-S1 disc rupture. (Tr. 233.) Dr. Surber noted Plaintiff was "very, very anxious" but fairly cooperative during the examination. (Tr. 234.) Based on his examination, Dr. Surber determined Plaintiff would be able to: occasionally lift or carry at least ten to twenty pounds for up to one-third to one-half of an eight-hour work day; stand or walk with normal breaks for up to two to four hours; and sit with normal breaks for up to six to eight hours of an eight hour work day. (Tr. 237.) On June 13, 2007, state medical consultant Dr. Glenn James determined that Plaintiff did not have a physical impairment that resulted in significant vocational limitations.[2] (Tr. 61, 263.)

On June 8, 2007, Plaintiff went to the Emergency Room ("ER") at Cookeville Regional Medical Center ("CRMC") complaining of low-back pain after falling down some stairs. (Tr. 256–62.) Dr. Melvin Rapelyea examined Plaintiff and found minimal disc space narrowing at L4-L5 and small spurs, consistent with acute muscle spasm. (Tr. 262.) On September 6, 2007, Dr. William Humphrey performed an MRI at the request of Dr. Berkman and found circumferential disc bulge at the L4-L5 level and an apparent laminectomy defect on the left L5-S1 level. (Tr. 360.) Due to the location of the injury on the same disc and same side as Plaintiff's two prior ruptures, Dr. Berkman determined it was "more likely than not" that Plaintiff re-aggravated his surgically repaired disc. (Tr. 347.) On December 19, 2007, Dr. Berkman recommended surgery after an epidural steroid block was ineffective. (Tr. 351.) Plaintiff instead decided to pursue pain management and did not return to Dr. Berkman until May 2008. (Tr. 344.)

---

[2] The ALJ opinion mistakenly refers to Glenn James as James Glenn but the pertinent analysis is unaffected. (Tr. 61.)

On November 10, 2007, Dr. James N. Moore conducted a Physical Residual Functional Capacity ("RFC") Assessment as part of Plaintiff's disability application.[3] (Tr. 283–90.) Based on CRMC records after Plaintiff's June 2007 visit to the ER, Dr. Moore found Plaintiff had no non-exertional limitations. (Tr. 285–87.) Dr. Moore also found that Plaintiff could: lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, and; sit, stand, and/or walk for about six hours in an eight-hour workday, with normal breaks. (*Id.*) Dr. Moore further noted that Plaintiff was otherwise unlimited in his ability to push and/or pull, including in the operation of hand and/or foot controls. (*Id.*)

On May 9, 2008, Plaintiff returned to Dr. Berkman, who suggested further imaging studies to make sure Plaintiff's injury was a recurrent disc rupture rather than scar tissue. (Tr. 344.) On May 23, 2008, Dr. Michael Spellman performed an MRI and found mild bilateral neural foraminal stenosis and mild right lateral recess stenosis at disc L4-5. (Tr. 342.) Dr. Spellman also found moderate left lateral recess stenosis and moderate bilateral neural foraminal stenosis at disc L5-S1. (*Id.*)

On June 25, 2008, Plaintiff visited Dr. Tarek Elalayli at the Southern Spine Center for an independent examination. (Tr. 418–20.) Dr. Elalayli opined that Plaintiff's issue at the time was related to Plaintiff's original work injury in 1997. (Tr. 421.) Dr. Elalayli concluded that surgery to perform a complete discectomy and fusion at L5-S1 would be a reasonable treatment option. (Tr. 420.)

On September 15, 2008, Plaintiff visited Dr. Berkman and agreed to surgery for his recurrent disc rupture. (Tr. 375–76.) As part of a pre-surgery physical, Plaintiff acknowledged

---

[3] Plaintiff refers to Dr. James B. Millis in the supporting memorandum for his Motion (Doc. No. 17 at 4, 20) and his Objection (Doc. No. 23 at 2). The Court understands these references to be intended for Dr. Moore.

occasional alcohol use and tested positive for cocaine and occasional marijuana use. (Tr. 375.) Plaintiff took numerous medications at the time, including Trazodone, Lortab, Lunesta, and Zoloft. (*Id*.) On September 18, 2008, Dr. Berkman performed L5-S1 disc surgery on Plaintiff. (Tr. 373–74.)

On October 3, 2008, Dr. Berkman reported that Plaintiff's surgery "went very well" (Tr. 369), but Plaintiff returned to Dr. Berkman twelve days later complaining of radiculopathy. (Tr. 370.) Neither a CT scan nor a bone graft revealed any disruptions of the nerve root. (*Id*.) Dr. Berkman prescribed Plaintiff 75 milligrams of Lyrica twice a day. (*Id*.) By November 12, 2008, Plaintiff was not feeling any better, and Dr. Berkman increased Plaintiff's Lyrica dosage to 75 milligrams, three times a day. (Tr. 371.) On January 23, 2009, Dr. Berkman consulted Plaintiff's EMG and concluded that Plaintiff's nerve was not damaged. (Tr. 372.) A myelogram and post-myelogram CT showed a small crack adjacent to the entry point on a pedicle screw on the left at S1, but the axial views showed the crack was removed from the nerve root. (*Id*.) Dr. Berkman showed Plaintiff the imaging films, and Plaintiff responded that he was feeling a bit better. (*Id*.)

On May 29, 2009, Plaintiff saw Dr. Berkman and reported that his left leg pain had subsided. (Tr. 417.) However, Dr. Berkman observed that Plaintiff had not rehabilitated his back well and still had significant back pain, which "really precludes him from any sort of work. He cannot sit for very long, cannot stand for very long." (*Id*.) Dr. Berkman found that Plaintiff had some residual nerve deficit, although his SI radiculopathy had resolved. (*Id*.) Dr. Berkman prescribed Plaintiff ninety 7.5 milligram tablets of Lortab without refills and referred him to pain management. (*Id*.) Dr. Berkman declined to determine Plaintiff's final impairment rating at that

time because Plaintiff had not undergone proper physical therapy, which Dr. Berkman thought would improve Plaintiff's condition. (*Id.*)

2. Psychological History

Plaintiff's psychiatric treatment began following a suicide attempt in December 2006. On December 23, 2006, jail staff brought Plaintiff to PMHC for a psychological evaluation after he attempted to hang himself while incarcerated. (Tr. 328–33.) During the examination, Plaintiff stated he had "nothing left to live for now" and was tearful throughout. (Tr. 329, 332.) On December 24, 2006, PMHC staff committed Plaintiff to Moccasin Bend Mental Health Institute ("Moccasin Bend"). (Tr. 223–25, 333.) Plaintiff's Global Assessment of Functioning ("GAF")[4] improved from 25 at admittance to 35 at discharge three days later, although he maintained his claim of depression. (Tr. 223–24.) Plaintiff stated that he had a history of alcohol, cocaine, and marijuana use. (Tr. 223.) Moccasin Bend staff prescribed Plaintiff Trazodone as a sleep aid and transferred him back to jail on December 27, 2006. (Tr. 224.)

On January 15, 2007, Plaintiff began voluntary treatment at PMHC for depression. (Tr. 173, 324.) On February 22, 2007, PMHC Nurse Practitioner Holly Robertson assessed Plaintiff a GAF score of 49 and diagnosed him with Major Depressive Disorder, Recurrent, Moderate, Polysubstance Dependence, and back, knee, and ear pain. (Tr. 326.) These diagnoses remained unchanged (Tr. 291–327, 389–416) throughout his treatment at PMHC (Tr. 413). During this

---

[4] The GAF test is a subjective determination that represents the "clinician's judgment of the individual's overall level of functioning." *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 924 n.1 (E.D. Mich. 2005) (citing American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 1994)). The score ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31 to 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF score of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

9

time Plaintiff once denied any drug use besides drinking an occasional beer (Tr. 319), but other times mentioned frequent marijuana use (Tr. 293, 409). Plaintiff did not consistently take medications as prescribed (Tr. 310, 396) and failed to attend many of his scheduled counseling sessions (Tr. 291–92, 304, 306, 316, 321–23, 389–90, 392, 394–95). During a counseling session with Dr. Taylor Fife, on December 26, 2007, Plaintiff claimed that his December 23, 2007, suicide attempt was purely an effort to get out of jail. (Tr. 293.)

On April 11, 2007, Dr. Lawrence Edwards performed a clinical interview and mental status examination on Plaintiff as part of the DIB and SSI application process. (Tr. 226–32.) Plaintiff reported symptoms of depression, including anhedonia, sleep disturbance, and feelings of worthlessness. (Tr. 229.) Dr. Edwards also observed signs of depression during the evaluation, including irritability, tearfulness, and dysphoric mood. (*Id.*) No symptoms of mania or anxiety were reported or observed during the evaluation. (*Id.*) After reviewing the December 23, 2006, PMHC Crisis Assessment Summary completed after Plaintiff's suicide attempt and the February 22, 2007, evaluation by PMHC Nurse Practitioner Robertson (Tr. 227), Dr. Edwards found that Plaintiff was moderately limited in the area of interacting with others. (Tr. 231.) Dr. Edwards diagnosed Plaintiff with Major Depressive Disorder, Recurrent, Moderate, and assessed his GAF score between 60 and 70. (Tr. 230.)

On May 9, 2007, as part of his disability application, Plaintiff underwent a psychiatric review by Dr. Fawz Schoup. (Tr. 238–54.) Dr. Schoup determined that Plaintiff suffered from Major Depressive Disorder, Recurrent, Moderate. (Tr. 241.) Based on these findings, Dr. Schoup conducted an RFC Assessment to further evaluate whether Plaintiff's functioning impairments qualified him for disability benefits. (Tr. 238–54.) In the RFC Assessment, Dr. Schoup found that Plaintiff could concentrate on and persist for simple and detailed tasks,

despite some difficulty. (Tr. 254.) Dr. Schoup also found Plaintiff would have some, but not substantial, difficulty interacting with the public, co-workers, and supervisors.[5] (*Id.*)

On October 6, 2008, Dr. Taylor Fife completed a Tennessee Clinically Related Group Form as part of a yearly mental health reassessment for Plaintiff's psychological treatment. (Tr. 386–88.) Dr. Fife assessed Plaintiff a GAF score of 55 and determined Plaintiff to be in Consumer Group Three, persons who are formerly severely impaired. (Tr. 388.) Dr. Fife found that Plaintiff had mild restrictions in activities of daily living and moderate restrictions in the following areas: interpersonal functioning; concentration, task performance, and pace; and adaptation to change. (Tr. 386–87.)

### 3. Employment History

At the hearing on June 25, 2009, Plaintiff testified before ALJ Williams to his past work and education experience, as well as limitations that prevented him from performing any type of substantial gainful activity. (Tr. 19–21, 38–39.) VE Bullard also testified at the hearing regarding the employment opportunities that exist in the national economy for a person with Plaintiff's limitations, as described by ALJ Williams. (Tr. 42–45.)

Plaintiff testified that he completed the tenth grade and attained a GED, but did not receive any technical training. (Tr. 19.) Plaintiff further testified that he had held three different jobs since 1994: heavy equipment operator in construction work; plumber's helper; and laundromat attendant. (Tr. 19–21.)

Regarding physical limitations, Plaintiff testified that back and ankle pain prohibited him from returning to work. (Tr. 25–26.) Plaintiff stated that he was able to sit for only up to an

---

[5] Dr. William Regan conducted another Mental RFC Assessment on November 9, 2007, mirroring Dr. Schoup's conclusions. (Tr. 267.)

hour before needing to stand and move around, usually for periods of fifteen to twenty minutes. (Tr. 30.) Plaintiff claimed he could tolerate stationary standing for only about ten minutes (*id.*) and assessed his weight-lifting capabilities as approximately equal to a gallon of milk (Tr. 31). He said his activities consisted mostly of watching television, with occasional light weeding in the garden, dish-washing and vacuuming, cooking, and grocery shopping. (Tr. 29, 34–35.)

Regarding mental limitations, Plaintiff testified that he was seeking treatment at PMHC for depression, insomnia, and anxiety. (Tr. 31.) Plaintiff stated he could get along with the people around him, but had trouble with large crowds. (Tr. 31–32.) Plaintiff also testified that he rarely left the house and did not belong to any groups. (Tr. 32–33.) He described recently worsening insomnia, but was able to sleep after being prescribed Ambien and Trazodone. (Tr. 32.)

Based on ALJ Williams's RFC Assessment of Plaintiff as described at the hearing (Tr. 42–43), VE Bullard testified that Plaintiff could not perform any past relevant work, but that there were multiple jobs Plaintiff could perform at the light, unskilled level (Tr. 43). VE Bullard used her experience and knowledge of these occupations to conclude that they would include a sit/stand option, as required by ALJ Williams's assessment. (Tr. 42–44.) Additionally, VE Bullard noted that lying down outside of normal breaks, more than two monthly absences, or pain that is moderately severe to severe during the work day would preclude an individual from performing competitive work. (Tr. 44–45.)

## II.   STANDARD OF REVIEW

The Court's review of the Magistrate's Report is *de novo*. 28 U.S.C. § 636(b) (2012). This review, however, is limited to "a determination of whether substantial evidence exists in the record to support the [Commissioner's] decision and to a review for any legal errors." *Landsaw*

12

*v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Title II of the Social Security Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (2012). Accordingly, the reviewing court will uphold the ALJ's decision if it is supported by substantial evidence. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Substantial evidence is a term of art and is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996) (citing *Consol. Edison*, 305 U.S. at 229).

A finding of substantial evidence holds significant weight on appeal. "Where substantial evidence supports the Secretary's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion." *Her v. Comm'r*, 203 F.3d 388, 389 (6th Cir. 1999); *see also Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc)). This standard of review is consistent with the well-settled rule that the reviewing court in a disability hearing appeal is not to weigh the evidence or make credibility determinations, because these factual determinations are left to the ALJ and to the Commissioner. *Hogg v. Sullivan*, 987 F.2d 328, 331 (6th Cir. 1993); *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). Thus, even if the Court would have come to different factual conclusions as to the Plaintiff's claim on the merits than those of the ALJ, the Commissioner's findings must be affirmed if they are supported by substantial evidence. *Hogg*, 987 F.2d at 331.

### III. PLAINTIFF'S OBJECTION TO THE MAGISTRATE JUDGE'S REPORT

Plaintiff raises a single objection to the Magistrate's Report. (Doc. No. 23.) Plaintiff argues that Magistrate Judge Knowles erred in finding that ALJ Williams properly rejected the opinion of his treating physician, Dr. Berkman. (*Id*. at 1.) Plaintiff claims that Dr. Berkman's May 29, 2009, statement—"that Plaintiff could not sit or stand for very long and Plaintiff's back pain really preclude[d] him from any sort of work" (Tr. 417)—operates as an opinion that Plaintiff cannot perform substantial gainful activity of any kind. (Doc. No. 23 at 1.) Plaintiff further argues that this opinion should be controlling, as Dr. Berkman observed and treated Plaintiff at various points over twelve years and three surgeries, and his opinion was consistent with objective medical evidence. (*Id*. at 2–6.) Specifically, Plaintiff claims ALJ Williams erred in assigning Dr. Berkman's statement little weight relative to other assessments made prior to Plaintiff's September 2008 surgery. (*Id*. at 2.) Plaintiff suggests that prior evaluations are inaccurate because they do not reflect Plaintiff's condition after his June 2007 fall or subsequent treatment. (*Id*.)

ALJ Williams acknowledged that Dr. Berkman "was the claimant's treating physician for his back impairment." (Tr. 60.) A "treating source" is one who has provided the claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1502, 416.902 (2011). An ongoing treatment relationship exists where the claimant receives treatment or evaluation of a frequency and nature typical for the claimant's condition. *See id*. The Court agrees with ALJ Williams's designation of Dr. Berkman as Plaintiff's treating physician for his back problems, as records of three back surgeries and numerous clinical visits from 1997 through 2009 clearly indicate ongoing treatment. (Tr. 203–04, 210–17, 220–21, 347, 351, 370–72, 417.) Therefore, the Court will

consider Dr. Berkman a treating physician when analyzing the weight assigned to his May 2009 statement by the ALJ.

    A.    *Weight Given to Dr. Berkman's Statement.*

After considering the entirety of the record, the ALJ assigned little weight to Dr. Berkman's statement because it was not consistent with objective medical evidence. (Tr. 60.) Courts have repeatedly held that treating physician opinions carry an initial presumption of great deference, and are generally entitled to greater weight than the opinions of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citations omitted). The ALJ will give controlling weight to a treating physician opinion regarding the nature and severity of a claimant's condition if it is consistent with other substantial evidence in the record and supported by accepted clinical and laboratory diagnostic tests. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). However, the ALJ is not required to give controlling weight to a treating physician's opinion if it is inconsistent with objective medical evidence in the record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2012).

Where a treating physician opinion does not satisfy the controlling weight standard, a presumption of great deference remains unless the ALJ determines that less weight is appropriate after considering "a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544). When discounting a treating physician opinion, the ALJ must provide "good reasons" that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)). Generally, the more support

15

and better an explanation a source provides for an opinion, the more weight it will be given. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). By contrast, the less consistent an opinion is with the record, the less weight it will be given. *See id.* §§ 404.1527(c)(4), 416.927(c)(4).

Here, Plaintiff argues that Dr. Berkman's statement should control his disability determination because Dr. Berkman was Plaintiff's treating physician for his back problems. (Doc. No. 1 at 1.)

The Court finds that substantial evidence supports ALJ Williams's decision to accord little weight to Dr. Berkman's May 2009 statement, as it is not consistent with objective medical evidence in the record. After his September 2008 surgery, Plaintiff complained to Dr. Berkman about continuing back pain. (Tr. 370–71.) In response, Dr. Berkman performed a CT scan on October 15, 2008 (Tr. 370), and an EMG and myelogram and post-myelogram CT scan on January 23, 2009 (Tr. 372). ALJ Williams considered the results of these tests when assessing weight to Dr. Berkman's May 2009 statement:

> After the surgery, the claimant continued to complain of some radicular symptoms. A CT scan however showed no problems. On January 23, 2009, Dr. Berkman reviewed the objective data with the claimant. An EMG was normal and showed that the nerve was not damaged. A myelogram and post myelogram CT showed a small crack adjacent to the entry point of the pedicle screw on the left at S1. However, on the axial views, it was no where near the nerve root and was tiny. Dr. Berkman noted that there was only some scar tissue around the S1 nerve root. The claimant reported he was feeling a little better.

(Tr. 60.) These diagnostic tests of October 2008 and January 2009 reveal no unexpected nerve damage and establish no underlying cause for Plaintiff's continued back pain. (Tr. 370, 372.) Such benign results are inconsistent with Dr. Berkman's conclusory statement of May 2009—that Plaintiff's back pain precluded him from doing any sort of work. (Tr. 417.) Because Dr.

16

Berkman's statement is not consistent with objective medical evidence, the regulations do not require the ALJ to give it controlling weight. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Even where they are not controlling, the opinions of treating physicians such as Dr. Berkman are often given great weight. *Rogers*, 486 F.3d at 242 (citing SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)). However, the Court finds that there is substantial evidence in the context of Dr. Berkman's statement to further justify the ALJ according it little weight, as the Dr. Berkman's explanation does not support Plaintiff's claim that the statement functions as a complete restriction on substantial gainful activity. (Tr. 417.) When weighing the non-controlling opinions of treating physicians, an ALJ considers a number of factors, including the support and explanation a source provides for an opinion. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). In Dr. Berkman's May 29, 2009, letter to Plaintiff's insurance company, the statement at issue preceded Dr. Berkman's own caveat explicitly declining to assess Plaintiff's RFC until after "a proper trial of physical therapy." (Tr. 417.) ALJ Williams considered this context, noting

> [Dr. Berkman] felt that it was premature to determine [the claimant's] impairment rating because he had not done a proper trial of physical therapy which would probably improve his condition. [Dr. Berkman] recommended a three week trial of physical therapy followed by a functional capacity examination. It was also recommended that the claimant return to see him after the physical therapy and imaging of the claimant's back would be reviewed at that time. He felt that he could not determine the claimant's restrictions until this was done.

(Tr. 60.) Dr. Berkman's broad explanation of Plaintiff's condition accompanying the May 2009 statement makes clear that the statement was not an RFC Assessment. (Tr. 417.) By recommending that an RFC Assessment follow a future trial of physical therapy, it is reasonable to conclude that Dr. Berkman did not intend his statement to be construed as an opinion that Plaintiff's back pain would necessarily preclude him from performing substantial gainful activity

17

indefinitely.  (*Id.*)  Thus, ALJ Williams was well within his authority to assess Dr. Berkman's statement little weight as a declaration of disability.

ALJ Williams gave specific reasons for assigning Dr. Berkman's May 2009 statement little weight.  (Tr. 60.)  Concerning diagnostic test results after Plaintiff's September 2008 surgery, the ALJ found that the statement was "*not consistent with the objective medical evidence*."  (*Id.* (emphasis added).)  Further, reading the statement in its appropriate context, the ALJ "noted that [Dr. Berkman] *declined to give an opinion on the claimant's functional capacity*."  (*Id.* (emphasis added).)  The Court finds that this inconsistency and the statement's explanation in context provide substantial evidence to support ALJ Williams's decision to accord little weight to Dr. Berkman's statement.

        B.        *Weight Given to Opinions Made Prior to Plaintiff's September 2008 Surgery*

In contrast with Dr. Berkman's statement, ALJ Williams assigned significant weight to other doctors' assessments describing limitations that would allow Plaintiff to perform at least light work because they are consistent with objective medical evidence.  (Tr. 60–61.)  SSA regulations instruct the ALJ to evaluate every submitted medical opinion, regardless of its source.  20 C.F.R. §§ 404.1527(c), 416.927(c).  Unless a treating physician opinion is controlling, the weight of any medical opinion is determined by the above-stated factors for assessing non-controlling treating physician opinions.  *Id.*; *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).  Plaintiff briefly references Dr. Surber in his Objection, arguing that Dr. Surber's April 2007 description of limitations is not accurate because it occurred before Plaintiff's June 2007 fall and subsequent treatment by Dr. Berkman.  (Doc. No. 23 at 2.)  This reasoning similarly applies to Dr. James's June 2007 review (Tr. 263–64) and Dr. Moore's November 2007 assessment (Tr. 283–90).

The Court finds that substantial evidence exists to support ALJ Williams's decision to assign significant weight to the aforementioned assessments made prior to Plaintiff's June 2007 fall or subsequent treatment, as they are consistent with objective medical evidence. The ALJ considered Plaintiff's subsequent treatment by Dr. Berkman when weighing these assessments, noting that "claimant has sought additional treatment for his back since the time of these determinations." (Tr. 60–61.) The most recent objective medical information available as a part of Plaintiff's subsequent treatment comes from tests and examinations performed by Dr. Berkman in response to continued complaints of back pain after Plaintiff's September 2008 surgery. (Tr. 370–72, 417.) As established in the analysis of the inconsistencies between these test results and Dr. Berkman's statement, the objective medical evidence revealed no further nerve damage or underlying causes for Plaintiff's back pain. (Tr. 370, 372.) These results only reinforce Dr. Berkman's post-operative comment that the surgery "went very smoothly." (Tr. 369.) Therefore, it was reasonable for the ALJ to weigh assessments made prior to Plaintiff's June 2007 fall or subsequent treatment as though the subsequent treatment did not alter their findings.

ALJ Williams did not discount Plaintiff's claims of pain, stating that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . . ." (Tr. 59.) Nor did the ALJ entirely reject the most recent opinion of treating physician Dr. Berkman from May 2009, in which Dr. Berkman explicitly refused to assess Plaintiff's long-term restrictions until after a trial of physical therapy. (Tr. 417.) The ALJ assigned little weight only to Dr. Berkman's statement that Plaintiff was unable to work due to pain (Tr. 60), which Plaintiff pulled from the larger opinion and construed as an indefinite restriction on substantial gainful activity (Doc. No. 23 at 1). ALJ Williams found that the

statement was inconsistent with Plaintiff's benign test results and not intended as binding commentary on Plaintiff's impairment. (Tr. 60.) The Court finds that the ALJ's considerations are supported by substantial evidence and well within the ALJ's province. Additionally, because he was not bound by Dr. Berkman's statement, it was proper for ALJ Williams to assign significant weight to the 2007 assessments of Dr. Surber and Dr. James.

For the above-stated reasons, the Court finds that substantial evidence supports ALJ Williams's finding that Dr. Berkman's statement does not control Plaintiff's disability determination and decision to assign it little weight. The ALJ found that Plaintiff was not disabled after properly assessing the entire record, and the Court is obliged to affirm this finding.

## IV. CONCLUSION

For the reasons stated above, the Court **ADOPTS** the Report, **DENIES** Plaintiff's Motion, and **AFFIRMS** the decision of the Commissioner. This Order terminates this Court's jurisdiction over the above-styled action, and the case is **DISMISSED**. The Clerk of the Court is **DIRECTED** to close the case.

It is so ORDERED.

Entered this the ___5th__ day of August, 2013.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT